HERRON v. SPENCER.

No. 34101. May 15, 1951.

*231 P. 2d 691.*

Finney & Finney, Idabel, for plaintiff in error.

George T. Arnett, Idabel, for defendant in error.

HALLEY, J. This action was commenced by Harold Spencer against L. G. Herron, d/b/a Herron Industries, to recover for services rendered over a period of six months. It was alleged that in May, 1944, L. G. Herron employed Harold Spencer to render services in the operation of a sawmill, timber lands, and post business. It was agreed that Spencer was to receive $200 per month and 5 per cent of the profit made during the time he was employed, before deducting income taxes. It was agreed that either party might terminate the agreement at the end of six months from June 1, 1944. The $200 per month was paid. L. G. Herron claimed that the business lost over $500 during the period Spencer was employed, and denied that he owed Spencer anything since no profit was made. The employment was terminated by mutual agreement on November 30, 1944.

Spencer based his claim of $75,000 profit on these facts: When he began working for Mr. Herron, he was handed a statement of the assets of Herron Industries, consisting of timber lands and equipment for the operation of a sawmill and post business. Mr. Herron had placed opposite each item his own estimate of its value. The value of about 10,000 acres of timber land and timber contracts then owned by him was fixed at $37,100. In November, 1944, and during the employment period, Mr. Herron gave to International Paper Company, a pulp-wood concern of

Camden, Arkansas, an option to buy 13,500 acres of timber land for $127,500. Some 1,960 acres of the most valuable land was withheld from this option agreement. The option was never exercised, but was refused by the proposed purchaser, chiefly because of the Oklahoma law against ownership of land by foreign corporations.

Mr. Spencer claims that the word "profit", as used in his contract with Mr. Herron, was intended to cover and did cover any increase in the valud of lands owned or acquired during his employment, and that the above mentioned option agreement established a profit of $75,000, and prayed for judgment for 5 per cent of that amount. The jury found that Mr. Herron made a profit during the employment period, and rendered a verdict for Harold Spencer for $1,875, and judgment for that amount was rendered. Mr. Herron has appealed.

It is contended that the judgment is not supported by sufficient evidence, in that it is not shown that a profit was made during the period of employment. It is claimed that the operation of the business lost over $500 during that period. There is no evidence to contradict the claim of loss in operations, unless the increase in the value of land be assumed from the option agreement and construed as "profit" under the contract of employment.

The services rendered by Spencer consisted largely of cruising, estimating, and appraising timber lands and giving experienced advice as to what land to buy and the price to pay. There is no claim that the services rendered were not efficient. The employment was terminated by mutual agreement at the end of six months, and on December 5, 1944, Mr. Herron, in a written release, made the following statement:

"In original employment agreed to by H. L. Spencer and Leonard G. Herron, the former was to be paid at a rate of $200.00 per month and was to receive 5% of net profit before income taxes were paid. Cumulative. Statement of profit and loss for the period ending November 30, 1944, will be furnished as soon as available.

"Herron Industries
"By Joe C. Herron."

Harold Spencer testified that the promised statement of "profit and loss" was never furnished, but that he was told that no profit had been made in the operation of Herron Industries. The plaintiff and L. G. Herron were in practical agreement as to the terms of the contract, the only appreciable difference in their testimony being that of L. G. Herron to the effect that:

" . . . he (Spencer) was to receive five per cent of the net profit from processing our timber."

What was meant by "profit" as used by the parties in their verbal agreement? The ordinary meaning of the word "profit", as used in accounting, is generally held to be the excess of income or receipts over expenses and expenditures. "Profit" was defined by this court in North v. Byrnes, 183 Okla. 321, 82 P. 2d 678, at page 681, as follows:

" 'Profit' in the ordinary acceptation of the law, is the benefit or the advantage remaining after all costs, charges and expenses have been deducted from the income, because, until then, and while anything remains uncertain, it is impossbile to say whether or not there has been a profit."

However, "profit" may be given a broader meaning. It is said in 50 Corpus Juris, Profit or Profits, at page 645, that:

" . . . In a wider sense it means any advantage, any accession of good from labor or exertion. 'Profit', it is said, is broad enough to cover any sort of advantage, advance or gain, and benefits of any kind. It is a relative term, and contemplates losses; in ascertaining the profits of a business one cannot take such items as show gain and reject such as show loss. Profit must be something of a tangible or pecuniary nature; intangible benefits, not capable

of measurement in definite terms, although of value to the recipient, cannot be called 'profits.' Without receipts or the equivalent in a business, 'profits' do not legally exist. But they may exist in kind as well as in cash; they may include land as well as money; and they may include not only the accumulations of earnings, but the advances or increment in value."

When we consider the circumstances of the parties when their contract was made, we do not feel that it could have been intended by them that Harold Spencer should be limited to 5 per cent of the profits made from the sawmill operations and the sale of posts. They were buying timber land for future operations and the growing of new timber. They were dealing in timber lands. The evidence shows that the $200 per month salary covered no more, probably, then the actual expenses of Harold Spencer in his work outside the mill. Numerous tracts of timber land were bought by Mr. Herron as a result of Spencer's inspection and appraisal. Mr. Herron kept his own books and accounts; Spencer did not even know how much had been paid for land or timber or how much was owing on the purchase price of land and timber.

We believe that the word "profit" was used by the parties in its broader sense, and was intended to include the increase in the value of lands acquired through the efforts of Harold Spencer, but was not intended to include the increase in value of lands owned by Herron Industries when the employment agreement was made.

There is no dispute but that L. G. Herron made an offer to sell part of his land for a definite sum, and that the prospective purchaser agreed conditionally to pay the price so fixed. This deal never was consummated. No effort was made to show how many acres of the land offered in the option agreement were owned by Mr. Herron on June 1, 1944, or how many acres included in the offer were acquired while Harold Spencer was employed.

The testimony of Harold Spencer in regard to the value of the lands was as follows:

"Q. At the time you set out this planned sale to the paper company, did you, or did Mr. Herron, or both, or all three of you, fix the value on that land at that time? A. Yes, sir.

"Q. What was the value placed on the land at that time by you and Mr. Herron? A. We placed a value of $9.50 an acre, and that would total around $129,000; but when Mr. Herron came back from his dealings with the paper company, he said he gave them an option, and I am sure his figure was $127,500.

"Q. Had there been any increase in the value of the land from the time you went to work and until that time? A. Yes, sir. That was when lumber started to boom, and pulp wood companies were getting interested in the timber, and it was going up fast. . . .

"Q. Have you checked the records to determine how much of the land *they now or* (sic) on November 30th, was acquired after June 1, 1944? A. No, sir.

"Q. Then you have no idea as to what the profit on any land would be? A. Yes, sir, I have a pretty good idea.

"Q. How can you fix the profit if you don't know where it was and what it was? A. Prior to November 20th, when we were listing all this land we sat down and listed each tract and set a value on 13,500 and some acres, that was his figure, he had the figures. I did not keep up with the book work, they kept the record, I worked in the wood. That is what he set up. Out of that we selected 1,960 acres of the best land that we would withhold from the sale. . . .

"Q. Do you have any method of determining the amount of profit that accrued to that land and that business from June 1st to November 30th, inclusive? A. I think so.

"Q. How do you compute it? A. The fact that he offered this land at a certain price, gave an option on it, that was cruised by an experienced timber estimator for the paper company at

an accepted value, that was willing to pay for the land on completion of title."

No qualified witness testified as to the market value of any land. An offer to sell is not proof of market value. The price paid for land has a bearing on its market value, but it is not conclusive. The value of the 1,960 acres of land not included in the offer to sell is wholly lacking in proof. The parties agreed that it had a value of perhaps $15 an acre at the time the option agreement was made, but neither party qualified as a competent witness to market value. Under the testimony in the record, the 1,960 acres retained by Mr. Herron may have been owned by him on June 1, 1944, or all of it may have been acquired during the employment and through the efforts of Harold Spencer, who was an experienced sawmill and timber-land employee.

The trial court evidently construed the agreement between Herron and Spencer as to the value of the land to be included in the option agreement, and as to the value of land to be retained, as sufficient proof of its market value. We cannot agree with this conclusion. Even if such agreement should be held sufficient proofs as to market value, we find no proof whatever of just what lands were included in the option agreement, because there is no showing as to what part, if any, of the 1,960 acres retained was owned by Mr. Herron prior to the employment of Harold Spencer.

In Price Bros. v. Cushing & O'Keefe, 135 Iowa 457, 110 N.W. 1030, the following rule was laid down in the second syllabus:

"One suing on an assignment of profits arising under a contract has the burden of showing there were profits, and failing to show there were any, is not entitled to judgment, although no issue is raised thereon, but the answer is that the assignor had been paid all that it was entitled to under its contract."

We are not unmindful of the rule that in a law action the verdict of a jury and judgment of the court will not be disturbed on appeal if there is any competent evidence reasonably tending to support the verdict and judgment. The record before us is so lacking in certainty and definiteness that we are unable to say that it supports the finding or judgment. We have concluded that it was the intention of the parties, in entering into the employment agreement, that Harold Spencer should have 5 per cent of the profits accruing from any source on the land acquired through his efforts, but not on the land owned by Mr. Herron at the time of employment. L. G. Herron and his son Joe Herron both testified positively that the business made no profit during the six months beginning June 1 and ending November 30, 1944. No books of account were introduced in evidence, and no statement of profit and loss was submitted.

The judgment of the trial court is reversed and the cause remanded for a new trial in accordance with the views herein expressed.

LUTTRELL, V. C. J., and CORN, JOHNSON, and O'NEAL, JJ., concur.